[No. S008142. Dec. 11, 1989.]

BARBARA JEAN SILVA-VIDOR, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Goldberg, Fuchs & Castro, Goldberg & Fuchs and Arthur L. Goldberg for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and Margaret E. Fourt for Respondent.

## OPINION

**THE COURT.**—We review the recommendation of the majority of the Review Department of the State Bar Court (review department) that petitioner Barbara Jean Silva-Vidor be suspended for five years, that the order of suspension be stayed, and that she be placed on probation for five years subject to certain conditions. Recommended conditions of probation include actual suspension from the practice of law for two years.

Silva-Vidor's only contention is that the two-year actual suspension recommended by the review department is too harsh, given the mitigating circumstances. She argues that 30 days' actual suspension, as was recommended by the hearing referee, would be more appropriate. We conclude that 30 days' actual suspension is inadequate in light of the seriousness of Silva-Vidor's misconduct. On the other hand, the review department's recommendation of two years' actual suspension is unnecessarily harsh given the significant mitigating circumstances. Consequently, we impose a one-year actual suspension.

### FACTS

Barbara Jean Silva-Vidor was admitted to the State Bar on May 31, 1979, and currently practices law in Los Angeles. She entered into a stipulation regarding the facts of this case. The stipulation indicates that Silva-Vidor's actions or failures to act affected some 14 clients. Although Silva-Vidor's earliest act of misconduct occurred in mid-1981 and her latest in early 1987, most of the violations took place between 1982 and 1984, while she was working as a sole practitioner.

Silva-Vidor stipulated to the following acts of misconduct:

1. As to seven clients, willful withdrawal from employment without taking reasonable steps to avoid prejudice to her clients, including failure to notify them and to deliver to them all papers and property to which they were entitled, in violation of her duties under Rules of Professional Conduct, rule 2-111(A)(2).[1]

2. As to six clients, willful failure to promptly return fees that had been paid in advance and that she had not earned, in violation of rule 2-111(A)(3).[2]

---

[1] New Rules of Professional Conduct became effective May 27, 1989. All "rule" citations refer to the former Rules of Professional Conduct, effective January 1, 1975, and in effect at times relevant herein, unless otherwise indicated.

[2] Silva-Vidor stipulated that the total amount of unearned legal fees she had received was approximately $1,710.

3. As to some 13 clients, willful and repeated failure to competently perform legal services, in violation of rule 6-101(A)(2).

4. As to two clients, willful failure to hold advance payments for costs and expenses in an identifiable client trust account, in violation of rule 8-101(A).

5. As to one client, willful failure to render an accounting of funds she held on behalf of the client, in violation of rule 8-101(B)(3). (The client, however, had actual knowledge of all disbursements that were made.)

6. As to two clients, willful failure to promptly pay or deliver funds she held upon their behalf, in violation of rule 8-101(B)(4). The total amount of money misappropriated from these two clients was $760.

7. As to three clients, willful commission of acts involving moral turpitude, dishonesty, or corruption, in violation of Business and Professions Code section 6106.

8. Willful practice of law from August 1, 1983, until January 2, 1987, in the State of California with knowledge that she was suspended from the practice of law during this period for failing to pay membership fees to the State Bar, in violation of Business and Professions Code section 6125.

9. By the above violations, a willful violation of her duty to support the Constitution and laws of the State of California, as required in Business and Professions Code section 6068, subdivision (a), and of her oath and duties as an attorney, in violation of Business and Professions Code section 6103.

A hearing was held on December 7, 1987, for the sole purpose of determining the appropriate discipline. At the hearing, Silva-Vidor testified that she had grown up in a troubled home environment and had obtained an education, while supporting herself, with governmental assistance. The evidence elicited at the hearing also established that between 1981 and 1984, the time during which most of the serious misconduct occurred, Silva-Vidor experienced severe financial and emotional problems that interfered with her ability to practice law. Silva-Vidor's psychological, physical and financial deterioration apparently began around 1981, when she married Dennis K. According to Silva-Vidor, K. used drugs extensively during the marriage and abandoned her and her children every six weeks or so.

In 1983 petitioner's professional association with another attorney ended, which apparently further contributed to her deterioration. Silva-Vidor testified that during this time she became increasingly depressed and physical-

ly withdrawn and would sometimes not leave her house for days at a time. With the help of a friend, Silva-Vidor sought the assistance of a psychiatrist, who diagnosed her as being severely depressed and recommended further counseling. For financial reasons, Silva-Vidor discontinued counseling after a few sessions.

Silva-Vidor testified that in 1984 her financial and emotional problems were exacerbated by a series of incidents. In the early part of that year she was involved in an automobile accident in which she dislocated her jaw. For a year and a half, she had to wear a mouth appliance to hold her jaw in place and she suffered severe headaches.

In May 1984, Silva-Vidor discovered both that she was pregnant with her third child and that her husband had a tumor near his brain. The next month her husband's tumor was removed. That same month Silva-Vidor and her husband permanently separated. After the separation, Silva-Vidor's husband contributed nothing to the financial support of Silva-Vidor or her children.

Later in 1984 Silva-Vidor suffered a slip-and-fall accident and, on the same day, fell while alighting from a bus. She sought medical treatment for her injuries and was bedridden for a few days. She testified that these events caused her to become more depressed.

In August 1984, Silva-Vidor suffered another slip-and-fall accident, resulting in a concussion, head and back trauma, and torn ligaments in her right leg. In addition, her five-month-old fetus experienced some fetal stress. As a result of the accident, Silva-Vidor was hospitalized for approximately a week, was forced to remain in bed after returning home and wore a cast on her leg for almost two months. Her financial situation worsened, and she was living in substandard housing. She testified that during this time she became suicidal and totally withdrawn. Ultimately, she contacted a suicide hot line and was referred to a licensed clinical social worker, who described Silva-Vidor as being very depressed, as having very low energy, as being socially withdrawn and as periodically having suicidal thoughts.

In December 1984, Silva-Vidor gave birth to her third child, who was diagnosed as suffering from a form of cerebral palsy. Silva-Vidor stated that she administered physical therapy to the baby at home. During this period she was still receiving no financial help from her estranged husband, and was waiting on tables and doing bookkeeping to support herself and her children.

Silva-Vidor continued to work with the licensed clinical social worker and by mid-1985 began to put her life back together. Pomona Valley Legal

Aid hired her to practice family law. About a year later, she transferred to the Pasadena Legal Service offices, where she continued to practice family law. At Pasadena Legal Services Silva-Vidor took over a relatively heavy caseload and began supervising paralegals. Her supervisor and co-workers testified that she had handled her caseload and other responsibilities very effectively and that there had been no complaints from clients about her work. In addition, since 1985 Silva-Vidor has volunteered her help at two shelters for battered women and at a family law center. In 1987 Silva-Vidor paid all the State Bar dues she owed.

At the December 7, 1987, disciplinary hearing, Silva-Vidor stated that she recognized that her conduct was wrong, that she felt remorseful and that prior to the hearing she had contacted some of the clients.[3] She also stated that she would not abandon her clients in the future, even if personal problems arose, because she had learned how to set up support systems for herself. These included: therapy sessions, participation in Al-Anon Family Groups (a support group for the family of alcoholics), and a well-structured job. She indicated an intent to continue her therapy sessions indefinitely and recognized that she is not well suited to conducting a solo legal practice.

On January 28, 1988, the hearing panel referee filed his decision, acknowledging that Silva-Vidor's repeated abandonment of clients and other breaches of conduct would normally merit a recommendation of disbarment or a lengthy suspension. However, the referee indicted that he was unable to determine that Silva-Vidor's violations were willful, because the extent and duration of Silva-Vidor's mental illness were unclear. In addition, he found that the mitigating circumstances were substantial and noted that witnesses had persuaded him that Silva-Vidor is now functional and free of the most debilitating aspects of her mental illness. He also observed that the public appears to be well served by petitioner's present employment as a legal services attorney. For these reasons the hearing panel referee recommended that Silva-Vidor be suspended from the practice of law for three years, but that execution of the suspension be stayed and that she be placed on probation for five years. The recommended conditions of probation were numerous and included 30 days' actual suspension.

The State Bar appealed the recommendation of the hearing panel referee to the review department, which rejected the referee's recommendation by a

---

[3] At the hearing Silva-Vidor testified that she was prepared to deliver the total amount of unearned legal fees she had received to the State Bar to be forwarded to the various clients to whom refunds were owed. At the hearing, the problem of getting the money back to the clients was discussed, and it was determined that the matter would be worked out after the hearing. At oral argument, counsel for Silva-Vidor indicated that all but one client, whom Silva-Vidor had been unable, despite significant effort, to contact, had been repaid. Moneys to repay the remaining client, when located, are being held aside by Silva-Vidor for that purpose.

vote of six to five. The majority of the review department stated that, but for the significant mitigating circumstances, disbarment would be appropriate and that, in their view, Silva-Vidor continues to suffer from significant, unresolved psychological problems. Concluding that both the protection of the public and the integrity of the Bar required greater discipline, the review department recommended that Silva-Vidor be suspended from the practice of law for five years, that the order of suspension be stayed, and that she be placed on probation for five years. As a condition of probation, it recommended that Silva-Vidor be actually suspended from the practice of law for two years and until she has shown satisfactory proof of her rehabilitation, her fitness to practice law, and her learning and ability in the general law.

Of the five members who dissented from the review department's decision, four believed the degree of discipline recommended was excessive. The other dissenter believed the recommended discipline was insufficient and that a showing of rehabilitation through readmission proceedings should be required. However, he also stated "[i]f the mitigation is to be believed, actual suspension is not indicated, but a substantially longer period of probation is required."

## DISCUSSION

■ Silva-Vidor's only contention is that the period of actual suspension recommended by the review department is too harsh. She does not question any of the other conditions of probation. Noting that our primary concerns in imposing discipline relate to the attorney's present fitness to practice law, she argues that she is not only currently practicing law effectively, but is making significant contributions to the legal profession. She asserts that this, along with the substantial mitigating circumstances, warrants that she receive the 30-day actual suspension recommended by the hearing panel referee rather than the 2-year actual suspension recommended by the review department.

■ Sanctions are imposed for professional misconduct in order to protect the public, the courts, and the legal profession, to maintain high professional standards by attorneys, and to preserve public confidence in the legal profession. (Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.3; see also *Mepham* v. *State Bar* (1986) 42 Cal.3d 943, 948 [232 Cal.Rptr. 152, 728 P.2d 222].) Although we attach significant weight to recommendations of the State Bar Court, we ultimately determine the appropriate degree of discipline. (*Smith* v. *State Bar* (1985) 38 Cal.3d 525, 539 [213 Cal.Rptr. 236, 698 P.2d 139].)

■ The stipulated facts demonstrate a common pattern of willful misconduct, involving abandonment and misrepresentations, misappropria-

tions of funds and other violations of law.[4] The offenses include accepting fees from clients, failing to perform services for which retained, not communicating with clients or responding to their inquiries, and not refunding advance fees. Silva-Vidor's abandonment of her clients without communicating with them, without returning their files and without taking steps to avoid prejudice to them amounted to a violation of rule 2-111. Such conduct generally subjects an attorney to suspension from the practice of law for at least one year. (See, e.g., *Davis v. State Bar* (1983) 33 Cal.3d 231 [188 Cal.Rptr. 441, 655 P.2d 1276]; *Gassman v. State Bar* (1976) 18 Cal.3d 125, 131-132 [132 Cal.Rptr. 675, 553 P.2d 1147].) Indeed, an attorney is generally subject to disbarment if such conduct becomes habitual and is combined with misrepresentations to a client. (*Carter v. State Bar* (1988) 44 Cal.3d 1091, 1100 [245 Cal.Rptr. 628, 751 P.2d 894].)

Moreover, Silva-Vidor stipulated that she willfully misappropriated $760 in client funds. ■ Misappropriation of client funds is a gross violation of an attorney's professional oath. (*Tenner v. State Bar* (1980) 28 Cal.3d 202, 206 [168 Cal.Rptr. 333, 617 P.2d 486].) Even where the amounts misappropriated are insignificant, or where the most compelling circumstances predominate, appropriate discipline is ordinarily at least one year's actual suspension. (*Lawhorn v. State Bar* (1987) 43 Cal.3d 1357, 1367-1368 [240 Cal.Rptr. 848, 743 P.2d 908]; Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 2.2(a).) Thus, 30 days' actual suspension, as recommended by the hearing panel referee, appears to be an insufficient sanction.

■ However, "[i]n our consideration of the nature of a disciplinary offense we are not insensitive to the personal and professional problems that frequently besiege the practitioner . . . ." (*Tenner, supra,* 28 Cal.3d at p. 207.) In some cases, personal problems may legitimately explain a period of inattention to an attorney's law practice. Because we believe that this is just such a case, we conclude that the review department's recommendation of two years' actual suspension is too harsh.

In many respects, the case at bar is similar to *Frazer v. State Bar* (1987) 43 Cal.3d 564 [238 Cal.Rptr. 54, 737 P.2d 1338]. In that case, John Frazer was found culpable of misconduct in 14 different matters. His misconduct included the closing and moving of his law practice without notifying his clients. Frazer's misconduct also involved five different loans that he obtained from individuals, and ultimately defaulted on. One of the loans was

---

[4] Although the hearing panel referee stated that he was unable to determine the willful nature of Silva-Vidor's misconduct, Silva-Vidor stipulated that her misconduct was willful. An attorney may not ordinarily be relieved from issues of fact to which he or she has stipulated. (*Coppock v. State Bar* (1988) 44 Cal.3d 665, 674-675 [244 Cal.Rptr. 462, 749 P.2d 1317].)

for $5,000, three of the loans were for $10,000, and one of the loans was for $24,860. Of the five loans, three were obtained by Frazer through deceit, and four of the loans were made by clients of Frazer during the existence of the attorney-client relationship and without a full disclosure by Frazer. Frazer was found culpable of, inter alia, abandoning clients, acquiring interests adverse to his clients and failing to accomplish the purposes for which he was hired. Based on the extent of Frazer's violations, both the hearing panel and the review department unanimously recommended disbarment.

However, we concluded that the hearing panel and the review department had given too little weight to the mitigating circumstances in Frazer's case. During the period of Frazer's misconduct, for approximately three years, he experienced financial problems and suffered from depression and agoraphobia.[5] Frazer was treated with antidepressive drugs that quickly diminished the symptoms of his illness; and he was attending weekly counseling. The doctors felt his prognosis was good, but acknowledged that there was always a possibility of recurrence. Prior to his misconduct, he had a record of six years of unblemished practice. Noting that Frazer cooperated fully with the hearing panel and that his misconduct occurred during "one aberrant period," we ordered that Frazer be suspended from the practice of law for a period of five years, that execution of the order of suspension be stayed and that he be placed on probation for five years upon numerous conditions, including actual suspension for one and a half years.

In light of our disposition in the *Frazer* case, the review department's recommendation of two years' actual suspension in this case is too harsh. As in *Frazer,* most of Silva-Vidor's misconduct was confined to the period in which she was experiencing severe financial and emotional problems. Although Silva-Vidor's problems do not excuse her misconduct, we indicated in *Frazer* that such conditions should constitute a significant mitigating factor. Moreover, as with Frazer, Silva-Vidor has substantially improved her condition through counseling. Indeed, the public now appears to be well served by her performance as a legal aid attorney and as an active volunteer in several different organizations serving the underrepresented. Furthermore, Silva-Vidor fully cooperated with the State Bar in the proceedings against her and has indicated a desire to make restitution to her former clients. In fact, in order to simplify the disciplinary proceedings against her, she entered into a stipulation as to the facts and culpability.

Although *Frazer* and the case at bench are similar in the above respects, there are several significant differences between the two cases. First of all,

---

[5] "Agoraphobia literally means fear of the marketplace; a person suffering from it becomes so incapacitated by anxiety that he becomes unable to function and his world progressively shrinks to the point where, in extreme cases, the individual cannot talk on the telephone or go out of his house." (*Frazer, supra,* 43 Cal.3d at p. 576.)

the amounts of money involved in Silva-Vidor's misconduct are substantially less than those involved in Frazer's case. For example, Silva-Vidor testified that the amount of unearned legal fees she had received totaled $1,710. The total amount of money that she misappropriated was less than $800. On the other hand, much of Frazer's misconduct arose from five loan transactions involving a total default of $59,860. These significant differences between the two cases suggest we should impose a shorter period of actual suspension in this case than we imposed in *Frazer*. We conclude that Silva-Vidor should be actually suspended from the practice of law for one year.

The State Bar further recommends that for the protection of the public we impose a condition that Silva-Vidor's actual suspension from the practice of law not end until she has shown proof satisfactory to the State Bar Court of her rehabilitation, fitness to practice law, and learning and ability in the general law, pursuant to standard 1.4(c)(ii) of the Standards for Attorney Sanctions for Professional Misconduct (Standard 1.4(c)(ii)). This standard is normally imposed when the length of actual suspension is two years or more.[6]

## DISPOSITION

Petitioner Barbara Jean Silva-Vidor is suspended from the practice of law in the State of California for a period of five years. Execution of the order for such suspension is stayed, and petitioner is placed upon probation for a period of five years subject to the following conditions:

1. During the first year of said period of probation she shall be suspended from the practice of law in the State of California;

---

[6]The imposition of such a condition in this case would mean that petitioner's actual suspension could last longer than one year if she failed before the end of her actual suspension to satisfy the burdens of proof it would impose on her. The State Bar originally suggested that proof to satisfy such a condition could be presented in compliance with the provisions of chapter 10, division IV of the Rules of Procedure of the State Bar, which govern reinstatement proceedings (except that no filing fee would be required). We find this unsatisfactory because of the danger we perceive that the State Bar, seeking to apply provisions formulated to govern reinstatement proceedings in a context for which they will not always be appropriate, may, owing to time constraints, be unable to afford petitioner an opportunity, well in advance of the end of the period of actual suspension, to meet her burdens under a condition patterned after Standard 1.4(c)(ii). It is important that a petitioner be guaranteed such an opportunity whenever such a condition is imposed.

The State Bar has subsequently advised us that procedures specially tailored to the objectives of Standard 1.4(c)(ii) are being formulated, and that they will address the concerns we have mentioned herein. We are thus persuaded that we ought not to impose Standard 1.4(c)(ii) as a condition of probation in this case.

2. During the period of probation, she shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

3. During the period of probation, she shall submit a report not later than January 10, April 10, July 10, and October 10 of each year or part thereof during which the probation is in effect, in writing, to the Office of the Clerk, State Bar Court, Los Angeles, which report shall state that it covers the preceding calendar quarter or applicable portion thereof, certifying by affidavit or under penalty of perjury (provided, however, that if the effective date of probation is less than 30 days preceding any of said dates, she shall file said report on the due date next following the due date after said effective date): (a) in her first report, that she has complied with all provisions of the State Bar Act and Rules of Professional Conduct since the effective date of said probation; (b) in each subsequent report, that she has complied with all provisions of the State Bar Act and Rules of Professional Conduct during said period; (c) provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph certifying to the matters set forth in subparagraph (b) hereof;

4. That she shall obtain psychiatric or psychological help from a duly licensed psychiatrist or a clinical psychologist not at state expense and shall furnish evidence to the Office of the Clerk, State Bar Court, Los Angeles, that she is so complying with each report that she is required to render under these conditions of probation; provided, however, that should it be determined by said psychiatrist or psychologist that the petitioner does not need psychiatric or psychological help, she may furnish to the State Bar a written statement from said psychiatrist or psychologist so certifying by affidavit or under penalty of perjury, in which event no reports or further reports under this paragraph shall be required and she shall not be required to obtain such psychiatric or psychological help;

5. Petitioner shall be referred to the Department of Probation, State Bar Court, for assignment of a probation monitor referee. Petitioner shall promptly review the terms and conditions of her probation with the probation monitor referee to establish a manner and schedule of compliance, consistent with these terms of probation. During the period of probation petitioner shall furnish such reports concerning her compliance as may be requested by the probation monitor referee. Petitioner shall cooperate fully with the probation monitor to enable him/her to discharge his/her duties pursuant to rule 611, Rules of Procedure of the State Bar;

6. As may be required by her probation monitor referee, the petitioner shall demonstrate that she has made a full effort to locate all clients or

former clients to whom she owes a refund of unearned fees and has made appropriate refunds to all such clients or former clients;

7. During that period of probation during which the petitioner is permitted to practice law, she shall report to her probation monitor referee as may be required by that referee, concerning the effectiveness and timeliness of communications and legal services to any clients she represents;

8. During the period of probation, the petitioner shall maintain on the official membership records of the State Bar, as required by Business and Professions Code section 6002.1, her current office or other address for State Bar purposes and all other information required by that section. Petitioner shall report to the membership records office of the State Bar all changes of information as prescribed by said section 6002.1;

9. Except to the extent prohibited by the attorney-client privilege and the privilege against self-incrimination, she shall answer fully, promptly and truthfully to the presiding referee of the State Bar Court, his designee or to any probation monitor referee assigned under these conditions of probation at the petitioner's office or an office of the State Bar (provided, however, that nothing herein shall prohibit the petitioner and the presiding referee, designee or probation monitor referee from fixing another place by agreement) any inquiry or inquiries directed to her personally or in writing by said presiding referee, designee, or probation monitor referee relating to whether the petitioner is complying or has complied with these terms of probation;

10. The period of probation shall commence as of the date on which the order of the Supreme Court herein becomes effective; and

11. At the expiration of said probation period, if she has complied with the terms of probation, said order of the Supreme Court suspending petitioner from the practice of law for a period of five (5) years shall be satisfied and the suspension shall be terminated.

Petitioner shall take and pass the Professional Responsibility Examination prior to the expiration of her period of actual suspension. It is further ordered that she comply with the requirements of rule 955 of the California Rules of Court and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, of the effective date of this order. Failure to comply with rule 955 may result in imprisonment. (Bus. & Prof. Code, § 6126, subd. (c).) This order is effective upon the finality of this decision in this court. (See Cal. Rules of court, rule 24(a).)

**BROUSSARD, J.,** Concurring and Dissenting.—I agree that multiple acts of misconduct, such as petitioner committed, should subject her to discipline, including some period of actual suspension from the practice of law. I also agree that in view of the pathetic record of tragedy, adversity and mishap that petitioner produced in mitigation, the State Bar Review Department's recommendation that we actually suspend petitioner for two years is excessive. The court reduces the period of actual suspension to one year; I would go further in reducing this period.

The referee heard and observed petitioner testify about her struggle to overcome her underprivileged background, the strain and collapse of her marriage with a substance abuser who failed to provide support for their children, the disruption of her professional association, her financial difficulties, her physical injuries, her emotional collapse, and the tragedy of the birth of her handicapped child. The referee heard the evidence of petitioner's recovery from her mental illness, and her competent contribution to society as a legal aid attorney. All this evidence persuaded the referee that, despite the record of misconduct, a 30-day actual suspension would adequately protect the public.

Although we conduct an independent review of the record, we give great weight to findings based on the referee's evaluation of the demeanor and credibility of witnesses. (*Frazer* v. *State Bar* (1987) 43 Cal.3d 564, 569 [238 Cal.Rptr. 54, 737 P.2d 1338]; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82].) I am most impressed by the referee's evident conclusion from the evidence that petitioner has suffered greatly, and has recovered her ability to function effectively. I fear that a year's actual suspension will undermine the admirable efforts petitioner has made to rebuild her professional and personal life, as well as her ability to provide for her family and continue the psychological counseling which the State Bar recommends during the period of probation. I would further reduce the period of actual suspension.